### A99A1821. IN RE ESTATE OF DAVIS.
(532 SE2d 169)

RUFFIN, Judge.

In October 1997, Thomas Edward Davis, Jr. ("Ted Davis" or "decedent") committed suicide after being accused of molesting two of his brother Jeffrey's children. Pursuant to the terms of his will, his father, Thomas Edward Davis, Sr. ("Davis" or "Ed Davis"), was made executor of his estate and sole residual beneficiary. Jeffrey Davis and his wife Leigh, individually and on behalf of their two children, petitioned to remove Davis as executor because he had destroyed evidence relevant to their lawsuit against the estate.[1] After a hearing, the probate court granted the petition, and Davis appeals. Because removal was within the probate court's discretion, we affirm.

The relevant facts are as follows. At some point in mid-October 1997, Ted Davis learned that a warrant had been issued for his arrest on molestation charges. On October 22 or 23, 1997, after learning of the charges, he committed suicide. On the afternoon of October 23, concerned because Ted had missed a scheduled appointment, Ed Davis went to Ted's house and found the police already on the scene. The police informed him that they had found Ted's body while attempting to serve an arrest warrant for sexual molestation. Ed Davis understood at the time that his son Jeffrey had instigated the warrant and that Ted was accused of molesting Jeffrey's children. Detective Wiley, one of the investigating officers, told Davis that he had discovered some sexually explicit material in the house and that he suspected more such material would be found.

Davis, an attorney, testified that he had drafted Ted's will, which made him executor of Ted's estate. From the time of Ted's death, Davis acted as if he were executor of the estate. Davis testified that, after the suicide, he searched his son's house and discovered a large amount of sexually explicit material, including videotapes, magazines, and documents that appeared to have been printed off the Internet. Although he did not view the videotapes, Davis claimed that the material consisted of gay adult pornography and that he did not see anything that would constitute child pornography. Davis testified that he placed such material in a rented storage building and

---

[1] To avoid confusion, Jeffrey and Leigh Davis and their children will be referred to collectively as appellees.

ultimately arranged for a trash contractor to collect and dispose of it. Davis claimed that Detective Wiley told him it was legal to dispose of the material, although he admitted that Wiley denied making such statement in his deposition.

Davis testified that at some point, he began searching through the files in Ted's computer. Although Davis claimed that he was looking for financial information, he also testified that he was looking for child pornography. He stated that he had previously attended an attorney general's seminar where he had learned about pedophilia. During his deposition, he said that he was specifically looking for child pornography and agreed that if he had found any, "we'd be in a different posture now" with respect to the molestation suit. At the removal hearing, he testified that, based on what he learned at the pedophilia seminar, he was looking for "a specific type" of child pornography, in particular pictures of the alleged victims.

Davis testified that, while searching through the computer, he came across several file folders containing sexually explicit material. He claimed that he did not, however, come across any pictures of the victims or anything that had to do with child pornography. He testified that he deleted the sexual material as he came across it. He knew, however, that deleted material could be retrieved, so he reformatted one of the drives on the computer.

In February 1998, appellees provided written notice to Davis that they were asserting a claim against the estate based on the alleged molestation. Appellees subsequently filed a civil suit against the estate in June 1998. During discovery, appellees had an expert examine the decedent's computer. The expert was able to retrieve a large amount of deleted pornographic material. This material consisted primarily of pictures of young males apparently under the age of 18, as well as sexual stories regarding young boys. Some of the stories involved boys having sexual relations with their uncles and other relatives, and some involved boys with the same first names as the two victims. The expert testified that many of the files that were deleted were probably irretrievable.

The expert testified that one of the drives had been reformatted and that the directories on the root drive were time stamped with a date of May 21, 1998, indicating that the drive had been reformatted on that date. In his deposition testimony, Davis stated that he could not pinpoint when he had deleted the material from the computer, although he was "almost positive" it was before he received notice of appellees' claim in February 1998. During his testimony at the removal hearing, Davis claimed that he deleted the material sometime in November or December 1997. He stated that his own computer was subsequently damaged by lightning in June 1998 and that he decided to use the decedent's computer as a replacement. He

claimed that he took both computers to a computer company to see if anything could be transferred from his own computer to the decedent's and that he assumes the company reloaded the original software onto the decedent's computer, which appellees' expert indicated could have caused the root drive directories to be restamped. However, Davis did not introduce any documentary evidence to support this claim or provide any testimony from the computer company.

In April 1998, after receiving notice of appellees' claims, Davis paid himself approximately $200,000 in executor fees. In November 1998, however, he informed appellees that he could not fund certain trusts established in the will for Jeffrey's children, stating that he had to freeze all assets of the estate because of the tort claim.

Appellees filed a petition to remove Davis as executor on December 11, 1998, alleging that he had a conflict of interest and improperly destroyed evidence relevant to their claim against the estate. Following a hearing, the probate court granted the petition on March 22, 1999. The order stated that Davis' letters testamentary would be revoked effective upon the qualification of his successor and invited all interested parties to petition for the appointment of a successor.

1. In his first enumeration of error, Davis claims the trial court abused its discretion in removing him as executor. For reasons discussed below, we disagree.

OCGA § 53-7-55, which became effective January 1, 1998, provides that,

> [u]pon the petition of any person having an interest in the estate or whenever it appears to the probate court that good cause may exist to revoke the letters of a personal representative or impose other sanctions, the court shall cite the personal representative to answer to the charge. Upon investigation, the court may, in the court's discretion . . . [r]evoke the personal representative's letters.

This statute replaced OCGA § 53-7-148, which allowed the court to remove an executor under certain specified circumstances, including if "for any reason he is unfit for the trust reposed in him." Cases construing the former statute make it clear that the probate court has broad discretion to remove an executor or administrator.[2] Although the revised statute uses a "good cause" standard, it does not lessen the probate court's discretion in removing an executor.

In its order, the probate court found that good cause existed for removal because Davis destroyed pornographic material found in the

---

[2] See *Nesmith v. Pierce*, 226 Ga. App. 851, 852 (1) (487 SE2d 687) (1997); *Lokey v. Lokey*, 82 Ga. App. 171, 174-175 (3) (60 SE2d 569) (1950).

decedent's home and on his computer. The court stated that such material would have had value as evidence in a civil lawsuit and that an independent fiduciary would not have destroyed the material. Thus, the court apparently concluded that Davis' actions were motivated by a conflict of interest in the administration of the estate.

Davis does not contend in this enumeration that destruction of evidence relevant to a claim against the estate is an insufficient reason to remove an executor. We note, however, that an executor has a duty "to act in the best interests of all persons who are interested in the estate and with due regard for their respective rights."[3] An executor holds an estate for the purpose of paying debts and distributing assets,[4] and "[t]he creditors, as well as legatees, have a right to have the estate legally administered by the executor."[5] Although it is the duty of an executor to defend tort claims brought against the estate,[6] we recognize the potential for conflict where the executor is also the residual beneficiary under the will and thus stands to gain from defeat of the claim. If such an executor, who has control over estate property by virtue of his office, wrongfully destroys or attempts to destroy evidence that would tend to support an arguably valid claim against the estate, we do not believe that a probate court would abuse its discretion in finding that good cause existed for the executor's removal.

Davis argues that he did not wilfully destroy evidence because he had no reason to anticipate the filing of a civil suit at the time he destroyed the pornographic material and deleted material from the computer. As discussed above, however, there was evidence that the computer was reformatted on May 21, 1998, about three months after appellees filed a written claim with the estate based on the alleged molestation. Although Davis claimed at the hearing that he had a computer company service the computer in June, he provided no evidence to support this assertion, and the probate court was not required to accept his testimony. Moreover, apart from the evidence of the reformatting date, the probate court could have concluded that Davis attempted to destroy the pornographic material in order to prevent its use in any proceeding against the estate. As an attorney, Davis could anticipate that a claim would be made against the estate based on the alleged molestation, particularly since appellees had already obtained an arrest warrant against the decedent. Indeed, Davis testified that his son Jeffrey had "never been hesitant about

---

[3] OCGA § 53-7-1 (a). See also *Home Ins. Co. v. Wynn*, 229 Ga. App. 220, 222 (1) (493 SE2d 622) (1997).

[4] See *Roe v. Pitts*, 82 Ga. App. 770, 774 (62 SE2d 387) (1950).

[5] *Bickerstaff v. Ellis*, 204 Ga. 734, 736-737, hn. a (51 SE2d 821) (1949).

[6] See *Davenport v. Idlett*, 234 Ga. 864, 866 (218 SE2d 577) (1975).

making claims for injury." Davis was well aware of the relevance of child pornography in a molestation action and admitted that such evidence would place the case "in a different posture." Although Davis claims that his intent in deleting the pornographic material was simply to "protect my family," he did not merely delete the material but took the additional step of having the hard drive reformatted. Davis testified that he reformatted the computer because he knew that deleted material "would always be there unless you reformatted it." The probate court could thus infer that Davis' intent was not simply to avoid embarrassment by deleting the offensive material, but to ensure that the material could never be retrieved by anyone.

There were other factors the probate court could have considered in rejecting Davis' claims of honest intent. For example, Davis testified that he did not come across anything he would consider child pornography, either on his son's computer or elsewhere in the house. When the computer was examined by an expert, however, the expert retrieved a large amount of sexually explicit material involving minors that had been deleted. Davis testified in his deposition that he examined each folder in the computer, although he did not look at every file within each folder. Davis' testimony at the removal hearing indicates that he went through the computer specifically to see whether there was anything to support appellees' charges of molestation, in particular any pictures of the alleged victims. In light of the amount of child pornography retrieved by the expert, the probate court could have found Davis' claim that he discovered only adult pornography unconvincing. Moreover, although Davis claimed that he had Detective Wiley's permission to dispose of the pornographic material discovered at the house, Wiley denied giving any such permission. And the fact that Davis claims to have sought Wiley's permission suggests that he was aware of the evidentiary value of such material in proving that the molestation occurred.

Davis also contends that, because appellees were able to retrieve a large amount of pornographic material, the estate was not harmed by his actions. We have rejected the proposition that, where a representative of an estate acts improperly, some identifiable loss to the estate must be shown before removal will be justified.[7] Moreover, the computer expert testified that not all deleted material could be retrieved, so there is no way of knowing whether the irretrievable material, or any of the documents and tapes that were physically destroyed by Davis, would have provided more direct evidence of the decedent's involvement in the alleged molestation.

---

[7] See *Lokey*, supra at 177 (4).

As discussed above, the relevant question in reviewing a removal order is whether the trial court had grounds to conclude that there was "good cause" for the removal. Where an executor destroys or attempts to destroy evidence in his possession that would help prove an arguably valid claim against the estate, we do not believe that the probate court abuses its discretion in removing the executor, particularly where, as here, the executor is the residual beneficiary under the will and thus stands to personally profit from defeat of the claim. Although we cannot say that the evidence was overwhelmingly in favor of removal, the probate court has broad discretion in such matters, and we cannot say that it abused its discretion in this case.[8]

2. Under OCGA § 53-6-13 (3), the probate court is to appoint an administrator if the executor becomes disqualified to serve. In its order, the probate court stated that "[a]ny interested party may petition this Court for the appointment of a successor fiduciary in accordance with the applicable laws." On appeal, Davis does not contend that it is improper to solicit nominees from interested parties but simply argues that appellees are not interested parties and should have no say in the selection of a successor. Nothing in the record, however, indicates that appellees have proposed a successor administrator or that an administrator has been named by the court. We decline Davis' request to issue an advisory opinion as to how the probate court should select a successor administrator, as the proper time to consider such issue is after a successor has been appointed.[9]

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 24, 2000.

*Savell & Williams, John C. Parker, Lisa J. Bucko,* for appellant.
*Long, Aldridge & Norman, Deborah Ebel, F. T. Davis, Jr., David E. Ralston,* for appellees.

---

[8] See *Nesmith,* supra; *Lokey,* supra at 174-175 (3).
[9] See *Vann v. Billingsley,* 234 Ga. App. 803, 805-806 (508 SE2d 180) (1998) (declining to issue advisory opinion where issue not ripe for decision); *Huff v. Valentine,* 217 Ga. App. 310, 312 (2) (457 SE2d 249) (1995) (declining to issue advisory opinion as to scope of trial court's discretion).